# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Brendan Liam O'Rourke,<br><br>                Petitioner,<br><br>v.<br><br>Joe Lizzaraga, et al.,<br><br>                Respondents. | Case No.: 15-cv-00696-BAS-JLB<br><br>**REPORT AND RECOMMENDATION DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## I.
## INTRODUCTION

On March 27, 2015, Brendan Liam O'Rourke ("Petitioner"), a California state prisoner proceeding pro se, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his state court convictions. (ECF No. 1.) On June 15, 2015, J. Lizzaraga ("Respondent") filed the Answer and Memorandum of Points and Authorities in Support of the Answer as well as lodgments of the state court record. (ECF Nos. 12 and 13.) The deadline to file a traverse was July 20, 2015. To date, no traverse has been filed in this case.

This Report and Recommendation is submitted to United States District Judge Cynthia Bashant pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California. Having reviewed the record, and for the reasons discussed below, the Court recommends the Petition be **DENIED**.

## II.
## PROCEDURAL BACKGROUND

Petitioner was charged and convicted on multiple counts of premeditated attempted murder and assault with a firearm when he opened fire at Kelly Elementary School during

the recess hour. (ECF No. 13-22 at 3.) Petitioner entered a plea of not guilty by reason of insanity and his trial was separated into two phases: a guilt phase and a sanity phase. (*Id.* at 2-4.) At the conclusion of the guilt phase, the jury found Petitioner guilty of numerous counts of premeditated attempted murder and assault with a firearm, with true findings on personal firearm use and great bodily injury enhancements. (*Id.* at 3.) After the sanity phase of the trial, the jury rejected Petitioner's not guilty by reason of insanity defense, "finding him sane at the time of the offenses." (*Id.* at 9). The trial court sentenced him to a determinate term of 90 years and an indeterminate term of 99 years to life. (*Id.*)

Petitioner filed a direct appeal to the California Court of Appeal. On appeal, Petitioner argued that the jury could not have reasonably rejected the evidence showing that he was insane when he opened fire at the school. (ECF No. 13-19 at 38-39; *id.* at 42.) Petitioner argued that he was insane because he was incapable of distinguishing moral right from wrong at the time of the shootings and that he had met his burden to show he was not guilty by reason of insanity on this basis.[1] (ECF No. 13-21 at 6.) The California Court of Appeal affirmed the jury's sanity phase verdict in an unpublished written opinion. (ECF No. 13-22 at 14-15.) The Court of Appeal found that the evidence at trial gave rise to conflicting inferences on the issue of sanity and thus, the jury was entitled to weigh these inferences and resolve the conflict. (*Id.* at 13 (citing *People v Wolff*, 61 Cal. 2d 795, 804 (1964)).) Petitioner filed a petition for review on this issue with the Supreme Court of California. (ECF No. 13-23.) On February 11, 2014, the Supreme Court of California denied review without comment.[2] (ECF No. 13-24.)

On May 27, 2015, Petitioner filed the present petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his state court convictions. (ECF No. 1.) Petitioner seeks relief for his convictions on the grounds that the jury could

---

[1] Petitioner acknowledged on direct appeal that he knew the quality and nature of his actions and that he knew his actions were legally wrong. Petitioner only argued that he did not know his acts were *morally* wrong. (ECF No. 1 at 6.)

[2] Petitioner did not file any state habeas corpus petitions.

not have reasonably rejected his claim of not guilty by reason of insanity. (*Id*. at 6, 12, 18.) Although labeled as three separate grounds, all three of Petitioner's claims amount to a single claim: a challenge to the sufficiency of the evidence supporting his conviction. Petitioner argues that the evidence during the sanity phase of his trial showed that he was unable to tell moral right from wrong at the time of the shooting and that said evidence was of such weight and character that it could not have reasonably been rejected by a jury. (*Id*.) The petition is timely[3] and properly exhausted.[4] (ECF No. 1; ECF No. 12 at 2.)

On June 15, 2015, Respondent filed the Answer and Memorandum of Points and Authorities in Support of the Answer as well as lodgments of the state court record. (ECF Nos. 12-13.) Respondent contends that the California Court of Appeal's rejection of Petitioner's challenge to the sufficiency of the evidence was not contrary to, or an objectively unreasonable application of, any clearly established Federal law as determined by the United States Supreme Court. (ECF No. 12-1 at 27-31.)

## III.

## **FACTUAL BACKGROUND**

The facts that follow are taken substantially from the California Court of Appeal opinion, an unpublished written decision affirming the judgment against Petitioner. (ECF No. 13-22.) A presumption of correctness attaches to state court determinations of factual issues on federal habeas review. 28 U.S.C. § 2254(e)(1).

> On October 8, 2010, [Petitioner] went to an elementary school during the lunch recess when there were many children on the playground. He had a gun in one hand and a gas can in his other hand. As he walked across the playground, [Petitioner] said "This is just a drill. These are not real bullets." He then started shooting at the children. As the children ran away from him, he chased them and continued shooting at them. When a

---

[3] *See* 28 U.S.C. § 2244(d)(1) (A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court).

[4] *See* 28 U.S.C. § 2254(b)(1)(A) (An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State).

noon duty employee confronted him, he pointed the gun at her and she heard it click. When the gun did not fire, [Petitioner] put down the gas can and tried to reload the gun. School employees continued to direct children to run to safety into classrooms. When a campus monitor approached [Petitioner] and asked, "What the hell are you doing?" [Petitioner] responded, "This is a drill, and these are blanks."

Several construction workers at the school intervened in the incident. [Petitioner] was still trying to reload his weapon, and the workers were trying to corner him and yelling at him to stop and put the gun down. [Petitioner] aimed the gun at the workers and moved towards them. A worker heard the gun click. Another worker was moving crying children inside the jobsite to get them away from [Petitioner]. [Petitioner] started running away across a field; he continued trying to load his gun as he was being chased by the construction workers. [Petitioner] exited the playground by climbing over a fence, and went towards his vehicle. Meanwhile, a construction worker ran to his truck, drove by [Petitioner's] vehicle, and told [Petitioner] to stop and put the gun down. When [Petitioner] pointed his gun at the construction worker, the worker ran into [Petitioner] with his truck. The workers kicked and hit [Petitioner], grabbed the gun, and held [Petitioner] until the police arrived.

[Petitioner] had ammunition and a gun speed loader in his jacket pockets. There was a propane tank on the sidewalk by [Petitioner's] vehicle. [Petitioner's] gas can, along with long matches, were found on the school grounds. An FBI bomb technician testified that a gas can, matches, and a propane tank are common materials used to create a large "fireball" explosion; i.e., by spreading the gas on the ground, lighting the gas, putting the propane tank in the middle of the gas, and then shooting the propane tank.

During the incident, witnesses observed that [Petitioner] looked "crazed," "distant, far-off" and "disconnected." He was yelling "something about Christians," and "Fuck Barack Obama"; "Kill Obama"; "Kill all the little fags"; and "Fuck A.I.G." Two children suffered nonfatal gunshot wounds from the attack. The jury convicted [Petitioner] of numerous counts of premeditated attempted murder and assault with a firearm,

with true findings on personal firearm use and great bodily injury enhancements.

Four psychiatrists (Drs. Jaga Glassman, Richard Rappaport, David Naimark, and Park Dietz) testified at the sanity phase of the trial. These experts summarized [Petitioner's] history of mental illness and his expressed motivations for the attack, and opined on the issue of his sanity at the time of the offense. All the doctors agreed that at the time of the offense [Petitioner] suffered from a serious mental illness involving delusional beliefs. There was also no dispute that he understood the nature and quality of his acts, and that he understood his acts were legally wrong. However, the experts were not unanimous on whether [Petitioner] understood his acts were morally wrong. Dr. Dietz (retained by the prosecution) opined [Petitioner] understood the immorality of his conduct, whereas the other three doctors opined he did not. Evidence presented at the sanity phase showed that [Petitioner] had long-standing delusions that members of a conspiracy were persecuting him, including by torturing him, holding him captive in a basement, threatening his life, preventing him from dating younger women, making false claims that he had committed rape, and telling women that he was homosexual. In the months prior to the offense, [Petitioner] sent e-mails to his half-brother (Larry) and made lengthy journal entries that set forth his beliefs and perceptions. In these writings, as well as in his statements after the offense, he stated that the members of the conspiracy (who were part of "AIG insurance" and the "Illinois Underground Political Weathermen") did not trust him because he knew about their illicit activities; they thought he might "narc" on them; the only way he could escape their persecution was to join them and commit a horrible terrorist act so that he would be discredited; and he had decided that he had no choice but to commit a terrorist attack in order to stop the persecution and to save and improve his life.

(ECF No. 13-22 at 2-5.)

///

///

///

5

15-cv-00696-BAS-JLB

## IV.

## STANDARD OF REVIEW

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in [*sic*] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

Additionally, Petitioner's habeas claims are subject to the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997) (Federal courts reviewing any petition filed in federal court after the April 24, 1996 enactment of "AEDPA," will apply its provisions). Under AEDPA, the standard of review for Petitioner's habeas claims, is as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Clearly established Federal law," as understood in the context of § 2254(d)(1), consists of holdings of Supreme Court decisions. *Williams v. Taylor*, 529 U.S. 362, 365 (2000) (stating that the phrase "clearly established Federal law," as determined by the United States Supreme Court, refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision"). In order

to grant habeas corpus relief, a federal habeas court must rule out whether it is possible that "fair-minded jurists" could disagree that the decision is inconsistent with clearly established federal law. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). To satisfy § 2254(d)(2), a petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest, assuming it rests upon a determination of the facts, are objectively unreasonable. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Where, as here, there is no reasoned decision from the state's highest court on appeal, the federal habeas court "looks through" to the underlying appellate decision to determine whether AEDPA's standard for habeas relief is met. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *see also Harrington*, 562 U.S. at 99-100 (holding that an unexplained denial of a claim by the California Supreme Court is an adjudication on the merits of the claim and is entitled to deference unless "there is reason to think some other explanation for the state court's decision is likely"). Therefore, the appellate decision before this Court is the California Court of Appeal's November 25, 2013, written decision affirming the jury's sanity phase verdict. (ECF No. 13-22.)

## V.

## DISCUSSION

As set forth above, Petitioner seeks habeas relief for his state court convictions on the ground that the jury could not have reasonably rejected his defense of not guilty by reason of insanity. Petitioner's argument focuses primarily on the trial testimony of Drs. Glassman, Naimark, Rappaport, and Dietz. Petitioner argues that the jury should have disregarded the testimony given by the prosecution's expert, Dr. Dietz, that Petitioner understood the morality of his actions at the time of the offenses. (ECF No. 1.) Specifically, Petitioner argues that Dr. Dietz lacked credibility, was biased, and did not properly differentiate and explain the elements necessary for a finding of not guilty by reason of insanity. (*Id.* at 12-13.) Due to these issues, Petitioner contends that the testimony of the three other experts that he was insane at the time of the offenses could not have been reasonably rejected by the jury. (*Id.* at 6, 12, 18.)

As an initial matter, it does not appear that Petitioner's claim relating to his insanity defense is a cognizable federal habeas claim. A district court will entertain a habeas petition on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner has not identified any case law holding that a claim raising the adequacy of proof of an insanity defense is a cognizable habeas claim. In fact, the district courts which have addressed the issue consistently hold that such a claim is ***not*** a cognizable habeas claim. *See*, *e.g.*, *Maria v. Grounds*, No. 13cv1183, 2015 WL 4608086, at *4 (C.D. Cal. Mar. 17, 2015) ("a claim regarding the adequacy of the proof of an insanity defense 'is really a challenge based on state law' procedures that does not raise a federal constitutional question"); *Moncada v. Smalls*, No. 09cv5745, 2012 WL 3150596, at *5 (C.D. Cal. Mar. 22, 2012) ("numerous courts have held that, where the defendant bears of the burden of proving insanity as a defense, constitutional challenges arising from a bifurcated trial regarding the defendant's sanity are not cognizable on federal habeas review"). Nevertheless, even if Petitioner's sanity phase evidence claim is cognizable on federal habeas review, it fails.

### A. The California Court of Appeal's Denial of Petitioner's Claim was not Contrary to, nor did it Involve an Unreasonable Application of, Clearly Established Federal Law

Petitioner does not dispute that all the elements required to convict him were met beyond a reasonable doubt. Instead, Petitioner argues that it was a constitutional error for the jury to reject his defense of not guilty by reason of insanity and convict him of the crimes charged. (ECF No. 1.) Petitioner raised this argument on appeal, and the California Court of Appeal affirmed the jury's sanity phase verdict, concluding that the jury could have reasonably rejected the evidence of insanity. (ECF No. 13-22 at 11-14.)

A state-court decision is "contrary to" the Supreme Court's clearly established precedents if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a

decision of [the Supreme Court] and nevertheless arrives at a different result." *Early v. Parker*, 537 U.S. 3, 8 (2002). As to Petitioner's plea of not guilty by reason of insanity, the Supreme Court of the United States has not said that a state is constitutionally required to recognize an insanity defense. *Medina v. California*, 505 U.S. 437, 449 (1992). *Cf. Hawkins v. Horal*, 572 F. App'x 480, 480-81 (9th Cir. 2014) ("[Petitioner] has not identified any case where the Supreme Court addressed challenges to the sufficiency of the evidence regarding sanity when a defendant bears the burden of proving insanity as an affirmative defense by a preponderance of the evidence. Therefore, he has not shown that there is a state or federal right to have the State prove sanity where it is not an element of the crime.").

To the extent that Petitioner's claim could be construed as a due process claim, the United States Supreme Court in *Jackson* stated that an essential safeguard of the Fourteenth Amendment's due process clause is that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof, defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of *every element of the offense*." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979) (emphasis added). Federal habeas courts must analyze *Jackson* claims "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011) (citation omitted). The *Jackson* standard permits relief only when "no rational trier of fact" could have found the elements necessary for guilt satisfied beyond a reasonable doubt. *Jackson*, 443 U.S. at 324. Further, where, as here, AEDPA applies, a federal habeas court must apply the standards of *Jackson* with an additional layer of deference and can only grant habeas relief if the state appellate court's application of the *Jackson* standard was "objectively unreasonable." *Boyer*, 659 F.3d at 965.

Here, California state law applies. Under California law, sanity is not an element of the crimes for which Petitioner was convicted. Rather, a claim of insanity operates as an affirmative defense to a criminal charge and is "separate and independent from the elements of any underlying crime." *People v. Hernandez*, 22 Cal. 4th 512, 522 (2000).

Thus, the present case is distinguished from *Jackson* because Petitioner's sanity was not an element required for the offenses for which he was convicted.

Therefore, because the United States Supreme Court has not yet recognized a constitutional right to present a not guilty by reason of insanity defense and California law states that such a defense operates separately from the elements of any underlying crime, the California Court of Appeal's determination that sufficient evidence existed to support the jury's sanity phase verdict was not contrary to, nor did it involve an unreasonable application of, clearly established Federal law.

**B.    The Court of Appeal's Rejection of Petitioner's Challenge to Jury's Sanity Phase Verdict did not Involve an Unreasonable Determination of the Facts in Light of the Evidence Presented**

Petitioner argues that no rational trier of fact could have concluded he was sane at the time of the attack in light of the evidence presented. (ECF No. 1.) Petitioner points to the fact that, of the four psychiatrists who testified during the sanity phase of his trial, three psychiatrists' opinions showed that Petitioner was legally insane at the time of the attack. (ECF No. 13-8 at 1337; ECF No. 13-9 at 1546-47, 1459.) The only psychiatrist that provided an opinion to the contrary was Dr. Park Dietz. (ECF No. 13-11 at 1815.) With respect to Dr. Dietz's opinion, Petitioner argues that it was null and should have been rejected for the following two reasons: (1) Dr. Dietz was purportedly biased;[5] and (2) Dr. Dietz's opinion was supported by faulty reasoning as he failed to properly differentiate between moral wrong and legal wrong.[6] (ECF No. 1.) Petitioner contends that these aspects of Dr. Dietz's opinion made the opinions of Drs. Glassman, Naimark, and Rappaport "virtually uncontradicted." (*Id.* at 6, 12, 18, 23.) Therefore, Petitioner contends

---

[5] Petitioner described Dr. Dietz's opinions as being "result-oriented – crafted to fit the desire of the prosecutors who hired him." (ECF No. 1 at 26.)

[6] During trial, Dr. Dietz stated that Petitioner's belief that if armed police had been at the school, they would have shot him reflected "[Petitioner's] knowing and understanding that he was using lethal force that is viewed as *morally* wrong." Petitioner argued that Dr. Dietz's opinion was flawed and was not based on "sound reasoning." (*Id.* at 26-27 (emphasis added).)

that because these experts' opinions could not have reasonably been rejected, the California Court of Appeal erred in affirming the jury's sanity phase verdict. (*Id.*)

"Under § 2254(d)(2), a federal court is relieved of AEDPA deference when a state court's adjudication of a claim 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). To satisfy this provision, the petitioner must demonstrate that the factual findings upon which the state court's adjudication rests, assuming it rests on a factual determination, are objectively unreasonable. *Miller-El*, 537 U.S. at 340; *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011). When analyzing insufficiency of the evidence claims, federal habeas courts must "respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." *Jackson*, 443 U.S. at 319.

Under California law, Petitioner's affirmative defense of not guilty by reason of insanity required that the jury find Petitioner "suffered from a mental defect." *People v. Coddington*, 23 Cal. 4th 529, 608 (2000), *overruled on other grounds by Price v. Superior Court*, 25 Cal. 4th 1046 (2001). Additionally, the jury then had to find that said mental defect rendered Petitioner "incapable of knowing or understanding the nature and quality of his act or incapable of distinguishing right from wrong at the time of the offenses." *Id.* In the context of legal insanity, "'wrong' . . . is not limited to legal wrong, but properly encompasses moral wrong as well. Thus, the defendant who is incapable of distinguishing what is morally right from what is morally wrong is insane, even though he may understand the act is unlawful." *Id.*

Also under California law, the finder of fact – in this case, the jury – is the "sole arbiter of a Defendant's sanity at the time of the charged crime." *Pop v. Yarborough*, 354 F. Supp. 2d 1132, 1138 (C.D. Cal. 2005). The jury's finding "cannot be disturbed on appeal if there is any substantial and credible evidence in the record to support such a finding." *People v. Dean*, 158 Cal. App. 2d 572, 577 (1958). Similar to the *Jackson* sufficiency of

the evidence standard discussed above, a state appellate court cannot overturn the trial court's conclusion of sanity unless it finds – as a matter of law – that the evidence of insanity could "not reasonably be rejected." *Skinner*, 185 Cal. App. 3d at 1059.

### 1. Expert Testimony at Trial

During the sanity phase of Petitioner's trial, four experts testified as to Petitioner's sanity at the time of the offenses. (ECF No. 13-8 at 1296-1402 (Dr. Jaga Glassman); ECF No. 13-9 at 1519-1598 (Dr. David Naimark); *id.* at 1411-1518 (Dr. Richard Rappaport); ECF No. 13-11 at 1738- 1872 (Dr. Park Dietz).) All four experts agreed that Petitioner suffered from a serious mental defect involving delusional beliefs when he committed the offenses. (ECF No. 13-8 at 1312 (Dr. Glassman); ECF No. 13-9 at 1545 (Dr. Naimark); *id.* at 1444 (Dr. Rappaport); ECF No. 13-11 at 1773 (Dr. Dietz).)[7] All four experts also agreed that Petitioner understood the nature and quality of his acts at the time of the offenses. (ECF No. 13-8 at 1360-61 (Dr. Glassman); ECF No. 13-9 at 1544 (Dr. Naimark); *id.* at 1460 (Dr. Rappaport); ECF No. 13-11 at 1779 (Dr. Dietz).) However, only three out of the four experts opined that Petitioner was incapable of distinguishing moral right from wrong and was therefore legally insane. (ECF No. 13-22 at 4.) The fourth expert, Dr. Dietz, opined that Petitioner understood the immorality of his actions at the time of the shooting, thus rendering him legally sane at the time of the attack. (ECF No. 13-11 at 1815.)

### a. Dr. Glassman's Opinion

During the trial, Dr. Glassman opined that Petitioner met the standard required to be found not guilty by reason of insanity. (ECF No. 13-8 at 1337.) He explained that Petitioner was in "tremendous conflict morally." (*Id.* at 1356.) Dr. Glassman went on to opine that "on the one hand [Petitioner knew it was] wrong to do something harmful to children; on the other hand, it's right to stop the torture. And so he was very conflicted

---

[7] Drs. Jaga Glassman and David Naimark were appointed by the court. Dr. Richard Rappaport was retained by Petitioner. Dr. Park Dietz was retained by the prosecution.

about that and, by the very definition, incapable of distinguishing [moral] right from wrong because of that." *Id.*  Dr. Glassman concluded that the circumstances surrounding the attack support a finding that Petitioner was insane at the time of the attack.  (*Id.* at 1355.)

### b. Dr. Naimark's Opinion

Dr. Naimark opined at trial that Petitioner did not know moral right from wrong at the time of the attack.  (ECF No. 13-9 at 1546.)  Dr. Naimark explained that "because of what [Petitioner] felt that he was going through and because of what he felt that he was being subjected to, that he may very well not have been able to distinguish that what he was doing was wrong at that time from something that would be right at that time."  (*Id.* at 1571.)  He testified that Petitioner "may have been confused around the moral issue."  (*Id.* at 1577.)  Dr. Naimark testified that under California law, Petitioner was legally insane at the time he committed the attack on the school.  (*Id.* at 1546-47.)

### c. Dr. Rappaport's Opinion

As part of his testimony at trial, Dr. Rappaport opined that Petitioner met the standard required to be found not guilty by reason of insanity.  (*Id.* at 1518.)  Dr. Rappaport explained that because Petitioner had delusions of being physically tortured, Petitioner believed he had no alternative but to follow the instructions of his torturers.  (*Id.* at 1443-44.)  Dr. Rappaport further explained that "in one context you could say [Petitioner knew his actions were] immoral or terrible but in another context, his feeling [was] that it was the right thing to do."  (*Id.*)  Thus, Dr. Rappaport concluded that Petitioner was legally insane because Petitioner believed anyone in those circumstances would have "done the same thing to stop the torture."  (*Id.* at 1459.)

### d. Dr. Park Dietz's Opinion

At trial, Dr. Dietz opined that Petitioner understood the immorality of his acts.  (ECF No. 13-11 at 1815.)  Dr. Dietz pointed to events prior to the shooting to support his opinion

that Petitioner knew his acts were immoral.[8] (ECF No. 13-11 at 1787-88.) Dr. Dietz also referred to instances before and after the attack, where Petitioner described his own actions as "horrible." (*Id.* at 1789-90.) Dr. Dietz explained that "the word 'horrible' carries with it the sense of moral condemnation . . . It's certainly a negative, undesired, undesirable activity that would be described as a horrible act." (*Id.* at 1789.) Additionally, Dr. Dietz referenced other instances prior to and after the attack when Petitioner referred to the school shooting as a "terrorist attack" and an "act of terror" to demonstrate Petitioner's moral condemnation of his actions. (*Id.* at 1792, 1794-95, 1799-1800.)

In further support of his opinion that Petitioner understood the immorality of his acts, Dr. Dietz pointed to the fact that during the attack, Petitioner made a statement to a female witness that it was just a "drill" and the gun was loaded with "blanks." (*Id.* at 1798.) With regard to this statement, Dr. Dietz opined that:

> [It was a] statement that in and of itself if there were no other evidence that told us about moral wrongfulness, that one alone tells us that in the midst of the crime he knows that there's a difference between a criminal act of shooting people and a drill that's just an exercise. And he's using a cover story, a pretext, to lull this woman into a false sense of security by pretending it's just a drill and he's shooting blanks. So that statement alone during the crime, I think, has great significance.

(*Id.*) Based on the materials he reviewed, Dr. Dietz opined with "reasonable medical certainty" that, at the time of the crimes, Petitioner "knew that his actions were terroristic, unlawful, subjected him to arrest, subjected him to being convicted of a felony, and were legally and morally wrong." (*Id.* at 1815.)

///

---

[8] By observing essays on morality written by Petitioner while enrolled at the University of Phoenix, Dr. Dietz determined that the fact that Petitioner had been delusional for years did not "knock out the morality center of his mind as it were, that his moral reasoning in general remained intact despite his delusional beliefs." (ECF No. 13-11 at 1787.) Dr. Dietz also relied on the fact that Petitioner repeatedly made statements to a co-worker saying that anyone who hurts children is "a coward and ought to be killed." (*Id.* at 1788.)

### 2. Dr. Dietz's Alleged Bias

Turning to Petitioner's arguments for federal habeas relief, Petitioner contends that Dr. Dietz was biased because his opinions were "result-oriented" for the prosecution which had retained him as an expert witness in this case. (ECF No. 1 at 26.) Petitioner argues that this bias tainted Dr. Dietz's testimony and greatly reduced its value; thus making it unreasonable for the jury to have accepted his testimony over those of the other three experts. (ECF No. 1 at 24.)

"[Q]uestions of witness credibility fall squarely and exclusively within the jury's purview." *United States v. Delgado*, 357 F.3d 1061, 1069 (9th Cir. 2004). This Court must presume that the jury resolved any conflicts regarding witness credibility or bias and must defer to that resolution on habeas review. *Id*. at 1068 ("the credibility of witnesses is a question for the jury, unreviewable on appeal"); *Wiley v. Hartley*, No. 12cv144, 2012 WL 2886682, at *10 (E.D. Cal. July 13, 2012) ("A federal habeas court 'may not reweigh the evidence or redetermine the credibility of witnesses.'"). If the evidence is unclear or would support conflicting inferences, "the federal court 'must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1993) (quoting *Jackson*, 443 U.S. at 326).

There is no basis for habeas corpus relief here. The only purported bias presented by Petitioner is the unremarkable fact that Dr. Dietz was retained by the prosecution and that his testimony supported the prosecution's case against Petitioner. (*See* ECF No. 1 at 26.) At best, Petitioner is speculating that Dr. Dietz was biased and that, but for that purported bias, Dr. Dietz would have provided testimony that supported Petitioner's insanity defense. Speculation is not an adequate basis for a habeas court to usurp the role of the jury as the triers of fact. In this case, a reasonable jury could have concluded that Dr. Dietz's presented unbiased testimony. *See also Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012) (when analyzing the sufficiency of the evidence to support the jury's findings on habeas review, "the only question under *Jackson* is whether that finding was so

unsupportable as to fall below the threshold of bare rationality"); *Jackson*, 443 U.S. at 320 (holding that, in reviewing sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").

Therefore, there is no basis for habeas corpus relief arising from Dr. Dietz's purported bias.

### 3. **Dr. Dietz's Alleged Failure to Differentiate Between Legal Wrong and Moral Wrong**

Petitioner challenges Dr. Dietz's opinion that Petitioner understood the immorality of his actions at the time of the attack. Petitioner essentially argues that this opinion testimony was unreliable and that this unreliable testimony was the only evidence from which the jury was able to reject Petitioner's insanity defense. According to Petitioner, the remainder of the sanity phase evidence showed that Petitioner was legally insane at the time of the attack – specifically, that he did not understand the immorality of his conduct at the time of the attack.

The California Court of Appeal issued the last reasoned decision on this question, finding:

> The record supports the jury's finding that [Petitioner] understood the immorality of his conduct at the time of the offense. Although the evidence showed he thought he had to commit the acts to stop the persecution he believed he was suffering, the jury was not compelled to find that he did not understand that it was immoral to shoot at innocent people at an elementary school, including children, notwithstanding his desperation to free himself from the perceived persecution. When writing and talking about the offense before and after its commission, he repeatedly described it as a horrible terrorist attack and stated he was doing it to save himself and improve his life. Because [Petitioner] stated that the attack was horrible and that his motive for committing the attack was to protect himself, the jury could reasonably infer that he understood the immorality of his decision to jeopardize the lives of innocent people in order to save himself.

> This is not a case where a defendant attacked his perceived persecutors; rather, [Petitioner] attacked people at an elementary school with no indication that he thought they had anything to do with his suffering. Nor is this a case where the defendant's thought processes were essentially focused on committing a crime to serve some greater public good that could provide subjective moral justification for the misconduct. Given [Petitioner's] repeated acknowledgement that his conduct was horrible and terroristic and that he was acting to save himself, the jury could reasonably conclude that he knew his conduct was morally wrong because he was acting to protect himself without regard to the severe trauma inflicted upon innocent people, including children.[] Moreover, even if the jury thought that [Petitioner] sincerely believed he was acting to expose corruption and to save his life, the jury could also find that his recognition of the horrific nature of his conduct reflected his understanding that under generally accepted moral standards, the exposure of corruption and even the saving of one's own life would never justify opening fire on innocent children at an elementary school.
>
> To support his challenge to the jury's rejection of his insanity claim, [Petitioner] asserts Dr. Dietz's opinion that he knew his act was morally wrong was not based on sound reasoning. He delineates various aspects of Dr. Dietz's testimony that he finds deficient for a variety of reasons. We are not persuaded. As set forth above, Dr. Dietz's opinions were well reasoned and supported by the evidence. Further, the record does not support [Petitioner's] contention that Dr. Dietz's testimony failed to differentiate between the moral component and the legal component of the right/wrong awareness standard. Dr. Dietz frequently focused his opinions on whether [Petitioner] understood the immorality of his conduct, and he did not simply address in unitary fashion the question of [Petitioner's] awareness of the wrongfulness of his conduct.

(ECF No. 13-22 at 11-13 (footnote omitted).)

The Court concludes that the California Court of Appeal's decision was not an unreasonable determination of the facts in light of the evidence presented. First, as the Court of Appeal explained, Dr. Dietz's opinion both was supported by the evidence showing Petitioner understood the immorality of his conduct at the time of the attack and

differentiated between the moral and legal components of the right/wrong awareness standard. (*Id.*; *see* ECF No. 13-22 at 13; ECF 13-11 at 1772, 1787-90, 1798.)  Second, because the evidence reasonably showed Petitioner understood the immorality of his conduct at the time of the attack, Dr. Dietz's testimony also was ***not*** the only evidence from which the jury could have rejected Petitioner's insanity defense.  Thus, a rational trier of fact may have rejected Petitioner's insanity defense without having to rely on Dietz's expert opinion.

Moreover, the burden was upon Petitioner at the sanity phase of his trial to prove by a preponderance of the evidence that he was insane at the time of the offense.  *Hernandez,* 22 Cal. 4th at 515.  Here, the jury's sanity verdict reflected the jury's determination that Petitioner failed to meet his burden.  The jury was not required to accept the opinions given by Drs. Glassman, Rappaport, and Naimark.  And the other evidence, even excluding Dr. Dietz's expert opinion that Petitioner understood the immorality of his actions at the time of the attack, was enough for the jury to reasonably reject Petitioner's insanity defense. Thus, viewing the evidence in the light most favorable to the prosecution, a rational jury could have rejected Petitioner's contention that he did not understand the immorality of his conduct at the time of the attack.  *See Coleman*, 132 S. Ct. at 2065; *Cf. People v. Skinner*, 185 Cal. App. 3d 1050, 1059 (1986) (the jury's finding of sanity at the time of the offenses must stand unless, "as a matter of law, the evidence of insanity [cannot] reasonably be rejected").

Therefore, the California Court of Appeal's rejection of Petitioner's challenge to the sufficiency of the sanity phase evidence was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

## VI.
## CONCLUSION

The Court submits this Report and Recommendation to United States District Judge Cynthia Bashant under 28 U.S.C. § 636(b)(1) and Civil Local Rule 72.1(d)(4) of the United States District Court for the Southern District of California.  For the reasons outlined above,

1  IT IS HEREBY RECOMMENDED that the Court issue an order: (1) approving and
2  adopting this Report and Recommendation, and (2) directing that Judgment be entered
3  DENYING Petition for Writ of Habeas Corpus.
4      IT IS ORDERED that no later than **March 28, 2016** any party to this action may file
5  written objections with the Court and serve a copy on all parties.  The document should be
6  captioned "Objections to Report and Recommendation."
7      IT IS FURTHER ORDERED that any reply to the objections shall be filed with the
8  Court and served on all parties no later than **April 11, 2016**.  The parties are advised that
9  failure to file objections within the specified time may waive the right to raise those
10 objections on appeal of the Court's order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th
11 Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).
12     IT IS SO ORDERED.
13 Dated:  March 7, 2016

*/s/ Jill L. Burkhardt*
Hon. Jill L. Burkhardt
United States Magistrate Judge